# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
### WESTERN DIVISION

LINDA SPRINGS,                                      Civil Action No. 1:10-cv-213
          Plaintiff,

                                         Weber, J.
       vs.                                   Litkovitz, M.J.

CINCINNATI CHILDREN'S
HOSPITAL MEDICAL CENTER,         **ORDER AND REPORT**
          Defendant.               **AND RECOMMENDATION**

Plaintiff Linda Springs, proceeding pro se, brings this action claiming race discrimination and retaliation by her former employer, defendant Cincinnati Children's Hospital Medical Center (Cincinnati Children's). This matter is before the Court on (1) defendant Cincinnati Children's motion for summary judgment (Doc. 53), plaintiff Linda Springs' opposing memorandum (Doc. 55), and defendant's reply memorandum (Doc. 58); (2) defendant's motion to strike plaintiff's amended memorandum in opposition to the motion for summary judgment (Doc. 59) and plaintiff's opposing memorandum (Doc. 60); (3) plaintiff's motion for leave of court to file the amended memorandum in opposition to the motion for summary judgment (Doc. 61); and (4) defendant's motion to strike plaintiff's reply to defendant's reply in support of its motion for summary judgment. (Doc. 64).

## I. Preliminary motions

Plaintiff timely filed her memorandum in opposition to the motion for summary judgment on January 20, 2012 (Doc. 55) and her amended response four days later on January 24, 2012. (Doc. 57). Defendant moves to strike the amended response on the grounds it is untimely;

plaintiff did not obtain leave of Court to file the amended memorandum; and the memorandum exceeds the 20-page limit set forth in S.D. Ohio Civ. R. 7.2(a)(3). Although plaintiff initially filed the amended memorandum without seeking leave of court, she subsequently moved for leave of court. Moreover, the substantive portion of the memorandum exceeds the 20-page limit by only a few pages. The Court therefore grants plaintiff's motion for leave to file the amended memorandum (Doc. 61) and denies defendant's motion to strike the amended response. (Doc. 59).

Plaintiff did not seek leave of court to file the reply memorandum she submitted in response to defendant's reply in support of the motion for summary judgment. (Doc. 63). Nor has plaintiff shown good cause for filing the additional memorandum. *See* S.D. Ohio Civ. R. 7.2(a)(2) (no additional memoranda beyond those enumerated in the Rule will be permitted except upon leave of court for good cause shown.) Accordingly, while the Court denies defendant's motion to strike the reply memorandum from the record, the Court will not consider the memorandum when deciding the recommended disposition of defendant's motion for summary judgment.

## II. Background

Plaintiff filed the complaint in this matter on April 9, 2010, against defendants Cincinnati Children's and its employees Erinn Gordon, Ann Marie Jenkins and Alan Henry.[1] Liberally construed, the complaint alleges that plaintiff's initial probationary period of employment was extended and she was ultimately terminated from her probationary employment with Cincinnati

---

[1] The individual defendants were dismissed by Order dated March 29, 2011 (Doc. 33), leaving Cincinnati Children's as the sole defendant remaining in the lawsuit.

Children's in retaliation for associating with an African-American female probationary

employee, Angela Whitterson, who was over the age of 40. Plaintiff alleges she was terminated

in retaliation for complaining to Erinn Gordon of defendant's Human Resources department on

February 20, 2009, about the extension of the probationary period. Plaintiff further alleges she

was denied unemployment compensation based on Cincinnati Children's inaccurate

representation that she had resigned. Plaintiff attached to the complaint a Notice of Right to Sue

issued by the Equal Employment Opportunity Commission (EEOC) on January 6, 2010.

Defendant construes the complaint as alleging the following claims for relief: (1) race

discrimination in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, et

seq. (Title VII); (2) retaliation in violation of Title VII; (3) creation of a hostile work

environment in violation of Title VII; and (4) violation of plaintiff's constitutional rights under

42 U.S.C. § 1983.

## III. Undisputed facts

Plaintiff applied for a position with Cincinnati Children's in September of 2008. (Springs

Depo., p. 68). She personally interviewed with Cincinnati Children's employees Phil Strong in

the Human Resources department; Alan Henry, the Supervisor of the Scheduling Center;

Annmarie Jenkins, the Director of Operations for the Scheduling Center; and another individual

whose name plaintiff does not recall. (Id., p. 69; Henry Aff., Doc. 53, Exh. A, ¶¶ 1, 2). After

interviewing plaintiff, Jenkins and Henry made the decision to hire her for the position of

Scheduling Agent I. (Henry Aff., ¶ 2). On or about October 13, 2008, plaintiff began

employment in the Scheduling Department (Springs Depo., p. 72; Depo. Exh. 11) along with five

other people, including three African-Americans, one Hispanic and one Caucasian. (Henry Aff.,

3

¶ 3).  Cincinnati Children's has a policy that all new employees must successfully complete an introductory period of 90 to 180 days.  (*Id.*, ¶ 4).

Springs' duties as a Scheduling Agent I were to schedule appointments for patients and accurately pre-register them by telephone.  (Springs Depo., pp. 74-75; Springs Depo., Exh. 10).  During the introductory period, Cincinnati Children's evaluated plaintiff's ability to perform these duties by having a Quality Auditor listen to some of her calls and score them based on whether she followed the proper call procedures.  (Springs Depo., p. 84; Henry Aff., ¶ 5).  Also during this period, Springs was trained by being paired with another agent, Nicole Cartone, a probationary employee herself who passed her probation approximately eight weeks after plaintiff began her employment.[2]  (Henry Aff., ¶ 6).  Plaintiff also sat with a team leader, Brian Price, "a couple of times" while she took calls.  (Springs Depo., pp. 98-99; Springs Depo., Exh. 13).  Plaintiff found this was useful because it afforded her the opportunity to listen to him, he offered her some very good tips, and she was able to incorporate and use the tips.  (Springs Depo., pp. 98-99).  In addition, plaintiff's direct supervisor Henry talked to her on a regular basis about her performance.  (*Id.*, pp. 75, 140).  Henry provided plaintiff with written error forms on December 22 and December 29, 2008.  (*Id.*, p. 145).

Plaintiff made mistakes during several calls over the course of the initial introductory period, including informing a patient that a doctor had left Cincinnati Children's; scheduling a patient for the wrong procedure; and scheduling a patient for a procedure at the incorrect location, which required the patient to travel from Cincinnati Children's Kentucky facility to Ohio for the appointment upon learning of the mistake.  (Springs Depo., pp. 83, 109-10; Henry

---

[2]Cartone was subsequently fired.  (Springs Depo., p. 135).

Aff., ¶¶ 7, 8).

At the end of plaintiff's probationary period, the probationary period was extended an additional 90 days with plaintiff's employment to be re-evaluated at the end of that period. (Springs Depo., Exh. 12). Henry met with plaintiff to provide her the evaluation for the introductory period, discuss her performance, and inform her of the extension of the introductory period. (*Id.*, pp. 81-82). Henry wrote on the evaluation that plaintiff had perfect attendance; she brought a positive attitude to work every day; but a determination had been made to extend plaintiff's probationary status for three months. (*Id.*, Exh. 12). He commented:

> Linda has made several errors that were considered more than just a normal mistake and considered more of a lack of good judgement. Her coaches feel that Linda gets frustrated easily and still gets confused in certain situations; this is causing her to make some poor decisions. Linda understands we will do all possible to help her move from probationary status, but ultimately the responsibility to improve is hers. At any time during this extended probationary status Linda's performance can be re-evaluated. If her performance has not improved a recommendation for termination can occur.

(*Id.*). Jenkins approved the evaluation as Department Head and wrote, "Linda, we will work with you to help you improve your quality. Thank you for your positive attitude." (*Id.*). Plaintiff wrote comments questioning some of the criticisms on the evaluation and stated that she had been confused by conflicting answers from team leads and trainers. (*Id.*). She stated she had consistently requested feedback on performance issues during the probationary period but had not received scores until the end of the period. (*Id.*). Plaintiff suggested biweekly written feedback in areas that needed improvement to clear up conflicting information. (*Id.*). Plaintiff signed the evaluation on January 22, 2009. (*Id.*).

During the extended probationary period, plaintiff began receiving her call scores every

few days from the Quality Auditor, Jenny Vastine, and the specific reasons in writing for the

points deducted.  (*Id.*, p. 97; Exhs. 14, 15, 16).  In addition, Price listened to some of her calls,

and Henry presented her with written error forms on January 21, January 26, February 3,

February 16 and February 19.  (*Id.*, pp. 95, 145).

Plaintiff scored below 88% on additional calls following the extension of her

probationary period.  (*Id.*, Exhs. 14, 15).  Jenkins subsequently met with plaintiff on February 6,

2009, and discussed plaintiff's job performance.  (*Id.*, Exhs. 22, 24).  During the meeting,

Jenkins informed plaintiff that she did not think the Scheduling Agent position was a good fit for

her and that although she thought plaintiff had a great attitude and excellent attendance, plaintiff

did "not demonstrate confidence when speaking with [Cincinnati Children's] callers or effective

call control, both of which are extremely important to the position."  (*Id.*, Exh. 24).  Jenkins

suggested that plaintiff begin looking for other employment.  (*Id.*, Exh. 22).  At the conclusion of

the meeting, Jenkins advised plaintiff that unless she saw marked improvement by the conclusion

of her introductory period, her employment would be terminated.  (*Id.*).

Following the February 6, 2009 meeting with Jenkins, plaintiff went to the Human

Resources department and met with Gordon on February 10, 2009.  (*Id.*, p. 113).  After the

meeting with Gordon, plaintiff drafted a letter to Gordon dated February 10, 2009, in which she

summarized the matters she had presented to Gordon in the meeting as follows:

- plaintiff had requested feedback from Henry several times during the 90-day probationary period
- plaintiff had requested scores from her supervisor several times; she did not receive them until the day before her 90-day probationary evaluation; and although her scores averaged 94%, she was given another 90-day probation

6

- during the probationary evaluation, plaintiff's supervisor said that she had a positive work attitude and that her attendance was very good, and she received no written feedback on her performance
- plaintiff had been told several times during her initial 90-day probation that there were unrelated call concerns, and each time she was so informed she accepted the advice and followed the directions she was given

(Springs Depo., Exh. 17). Plaintiff noted that during the meeting, Gordon agreed that she would speak with plaintiff's department and get written feedback on her performance. (*Id.*).

At her deposition, plaintiff testified that she mentioned other matters to Gordon that she did not list in the letter. (*Id.*, pp. 114-115). Plaintiff initially testified that she had told Gordon when she first went in to meet with her that she felt Jenkins "was being unfair and she was readily singling me out. I told her that also I felt that it was because of I know another girl in Human Resources [] that was complaining." (*Id.*, p. 114). Plaintiff explained that individual was Angela Whitterson, whose probation had likewise been extended. (*Id.*). Plaintiff explained, "And I felt that I was being associated with this black girl and I felt that that was part of the reason why my probationary evaluation was extended." (*Id.*, pp. 114-115). However, plaintiff retracted that testimony upon further questioning and clarified that she could not say whether she told Gordon during the meeting that she thought Jenkins was treating her unfairly because of her relationship with Whitterson. Plaintiff testified that she believed Jenkins interacted with her in the manner she described from the time of the meeting forward because of Jenkins' problem with her and Whitterson. Plaintiff stated that although she thinks she may have addressed that issue with Gordon at some point, it may not have been at the February 10th meeting. (*Id.*, pp. 115-116).

Plaintiff testified that when she met with Gordon, "I told her I thought I was being

7

discriminated against or singled out. I think I used the term singled out." (*Id.*, p. 111). When asked if she used the term "discriminated against," plaintiff responded: "I think I did because initially she said no, no, no, that's not the case. . . ." (*Id.*). Plaintiff testified that she indicated to Gordon why she thought she was being singled out, stating that she felt she had not been given a good reason for the probation extension; she had not received her scores; and nothing was done to resolve computer issues plaintiff was having. (*Id.*, p. 112). When asked whether plaintiff indicated to Gordon at any time during that meeting that she thought these things were happening to her because of her race, plaintiff answered: "I'm not sure. I think I implied it." (*Id.*).

From January to March 2009, Quality Control Auditor Jenny Vastine consistently emailed plaintiff her call scores together with specific comments outlining the areas in which she needed to improve. (*Id.*, Exhs. 14, 16). Jenkins met with plaintiff on March 11, 2009, to discuss two of her calls, including one on March 6, 2009, on which plaintiff received a score of 42%. (*Id.*, Exhs. 16, 22). Jenkins sent plaintiff a follow-up email the next day outlining the following areas in which immediate improvement was needed:

- the handle time on both calls was longer than necessary; there was an expectation that the call be handled in the most efficient manner possible; and she and plaintiff had discussed scanning for an appointment while speaking with the caller rather than waiting until the dialogue ends before scanning
- in order to avoid asking callers to repeat information frequently, plaintiff needed to practice active listening and write down information if necessary
- when the patient's mother sighed during a call, plaintiff made the specific comment, "I'm sorry I'm not moving fast enough for you but my computer does not move that fast," which was highly inappropriate
- plaintiff did not seem to be focused during these phone calls and did not exercise call control; her calls needed to reflect that she was focused on the call at hand and she needed to direct the call in a productive and efficient manner
- when a Cincinnati Children's physician is calling and indicating that a child needs to be seen soon, it would be appropriate to contact the department for assistance

8

- plaintiff did not address the Cincinnati Children's resident as "doctor," and it was expected that she would always use the proper name, especially when dealing with a physician

(*Id.*). Jenkins wrote that in the meeting, she had again advised plaintiff as she had on February 6th that she did not feel the Scheduling Agent position was a good job fit for plaintiff and she suggested that plaintiff begin looking for other employment. (*Id.*). Jenkins concluded as follows:

> We then talked a bit about the training you received and you indicated you were not adequately trained. However, you received the same training as your peers who were hired at the same time and we are not seeing the same issues noted above. As part of your training, you sat with an agent who is no longer with our organization but her departure was unrelated to her job performance. She was one of our most efficient schedulers, although she had only been with us approximately six months. During our discussion, you requested to sit with Liz, an experienced scheduling agent, in order to observe good call control and efficiency. Alan agreed to arrange for this and I understand from him that you were able to sit with Patrisha today for several hours. Liz was at Base today but Alan has arranged for you to spend time with her for a few hours tomorrow.
>
> In closing, we must see immediate improvement in your performance and we cannot see a degradation of your performance in any area, if you are to successfully complete your probationary period. The calls we reviewed were poor and we cannot observe calls like this in the future. We will continue to monitor your performance and provide you with regular feedback.
>
> Please let me know if I have not accurately documented our discussion or if anything has been omitted. If I don't hear from you, this will be an indication of your agreement.

(*Id.*, Exh. 22).

Plaintiff responded to Jenkins' email on March 14, 2009. (*Id.*, Exh. 23). Plaintiff responded to Jenkins' criticisms, expressing disagreement with Jenkins' assessment of her performance and specifically addressing the two calls Jenkins had discussed with her. However, plaintiff did not deny making the comments to the patient's mother who had sighed and failing to

9

address the resident physician properly.  Plaintiff also questioned the quality of the training she had received and expressed appreciation for the opportunity to sit with a more experienced agent on March 12, 2009, stating: "In those 4 hours, I learned things that had anyone taken the time earlier on, I am sure I would not be on a second probation." *Id.*  Plaintiff subsequently received scores of 75% and 79% on two calls received on March 13, 2009.  (*Id.*, Exh. 16).

Jenkins and Henry made the decision to terminate plaintiff's employment.  (Henry Aff., ¶ 11).  Jenkins, Henry and Gordon met with plaintiff at the end of March and informed her that because of her performance, they were giving her the opportunity to resign.  (*Id.*, pp. 150-51).  Plaintiff testified at her deposition that she was informed that if she did not resign, she would be fired.  (*Id.*, p. 151).  Plaintiff stated she was not resigning.[3]  (*Id.*).  Cincinnati Children's sent plaintiff a letter dated April 1, 2009, stating it had received and was accepting her resignation effective March 30, 2009.  (*Id.*, Exh. 26).

## IV. Summary judgment standard

Fed. R. Civ. P. 56 allows summary judgment to secure a just and efficient determination of an action.  The court may only grant summary judgment as a matter of law when the moving party has identified, as its basis for the motion, an absence of any genuine issue of material fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986).

The party opposing a properly supported motion for summary judgment "may not rest upon the mere allegations or denials of his pleading, but . . . must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby*, 477 U.S. 242, 248 (1986)

---

[3]For summary judgment purposes, Cincinnati Children's is treating the end of plaintiff's employment as a termination.

(quoting *First Nat'l Bank of Arizona v. Cities Serv. Co.*, 391 U.S. 253 (1968)). The evidence of

the nonmovant is to be believed and all justifiable inferences are to be drawn in her favor. *Id.* at

255 (citing *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 158 (1970)). However, a district court

need not view the facts in the light most favorable to the nonmoving party if that party's version

of events is "blatantly contradicted by the record, so that no reasonable jury could believe it."

*Scott v. Harris*, 550 U.S. 372, 380 (2007).

The court is not to weigh the evidence and determine the truth of the matter but is to

decide whether there is a genuine issue for trial. *Anderson*, 477 U.S. at 249. There is no genuine

issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return

a verdict for that party. *Id.* (citing *Cities Serv.*, 391 U.S. at 288-289). If the evidence is merely

colorable, *Dombrowski v. Eastland*, 387 U.S. 82, 84 (1967), or is not significantly probative,

*Cities Serv.*, 391 U.S. at 290, judgment may be granted. *Anderson*, 477 U.S. at 249.

**V. Defendant should be granted summary judgment as a matter of law on all claims**.

### A. Discriminatory discharge claims

Plaintiff alleges in her opposing memorandum that she can establish race-based

discrimination under Title VII.[4] Plaintiff asserts there is direct evidence of race discrimination

in the form of Jenkins' retaliatory threats and harassment, which show Jenkins' race-based

animus; Henry's refusal to inform plaintiff of his alleged concerns with her job performance,

together with his alleged disparate scoring of African-Americans and Caucasians on probationary

---

[4]Although the analysis of plaintiff's employment discrimination claims is the same under both Title VII and 42 U.S.C. § 1983, *see Shaw v. Danley*, No. 98-6579, 2000 WL 64945, at *3 n.2 (6th Cir. Jan. 10, 2000), plaintiff must show that defendant was a state actor at the time of the alleged violations in order to prevail on her claims under § 1983. *See Kottmyer v. Maas*, 436 F.3d 684, 688-89 (6th Cir. 2006). Plaintiff does not allege that Cincinnati Children's was a state actor. Defendant is therefore entitled to summary judgment on plaintiff's claims brought under § 1983.

evaluations; and Gordon's failure to investigate and pursue plaintiff's complaints of race

discrimination and bias during the extended probationary period. (Doc. 57, pp. 26-27)

Defendant argues that plaintiff cannot establish a claim of race discrimination because (1)

she has not produced direct evidence of race discrimination, and (2) she cannot establish a prima

facie case of race discrimination. (Doc. 53, pp. 9-12). Defendant contends that plaintiff cannot

satisfy all the elements of her prima facie case because she was not qualified for the Scheduling

Agent I position as she did not meet defendant's legitimate expectations for the position, and she

was not replaced by an individual outside the protected class. Defendant further argues that it

has articulated a legitimate non-discriminatory reason for terminating plaintiff's employment,

specifically, she failed to pass her probationary period because she performed poorly by making

serious mistakes, and plaintiff cannot establish that the articulated reason was a pretext for race

discrimination. (*Id.*, pp. 12-15). Defendant also argues that a lack of discrimination must be

inferred pursuant to the "same actor inference" because Jenkins and Henry terminated plaintiff a

little over five months after they personally interviewed her and made the decision to hire her.

(*Id.*, p. 15, citing *Mischer v. Erie Metro Housing Authority*, 168 F. App'x 709, 717 (6th Cir.

2006) ("The same-actor inference . . . allows [the court] to 'infer a lack of discrimination from

the fact that the same individual both hired and fired the employee'"); Springs Depo., pp. 69-70,

160-61; Henry Aff., ¶ 11).

An individual can establish a discrimination claim under Title VII through either direct or

circumstantial evidence that creates an inference of discrimination. *Younis v. Pinnacle Airlines,*

*Inc.*, 610 F.3d 359, 363 (6th Cir. 2010). "Direct evidence of discrimination is 'that evidence

which, if believed, requires the conclusion that unlawful discrimination was at least a motivating

factor in the employer's actions.'" *Wexler v. White's Fine Furniture, Inc.*, 317 F.3d 564, 570 (6th Cir. 2003) (en banc). "Circumstantial evidence, on the other hand, is proof that does not on its face establish discriminatory animus, but does allow a factfinder to draw a reasonable inference that discrimination occurred." *Id.*

Plaintiff has failed to come forward with direct evidence of discrimination. Plaintiff has not cited any evidence that requires the conclusion that race discrimination was at least a motivating factor in the termination decision. Therefore, to prevail on her claim of discriminatory discharge, she must establish a prima facie case of discrimination through circumstantial evidence by showing that: 1) she is a member of a protected class; 2) she suffered an adverse employment action; 3) she was qualified for the Scheduling Agent I position; and 4) she was either replaced by an individual outside the protected class or she was treated less favorably than a similarly-situated individual outside the protected class. *See Mitchell v. Toledo Hospital,* 964 F.2d 577, 582 (6th Cir. 1992); *Clayton v. Meijer, Inc.,* 281 F.3d 605, 610 (6th Cir. 2002).

There is no dispute here that plaintiff is a member of a protected class and that she suffered an adverse employment action in that she was terminated. Moreover, the evidence shows that plaintiff was qualified for the Scheduling Agent I position. Defendant selected plaintiff for the position, and defendant does not point to any objective evidence, such as a lack of education, experience in the industry, or required general skills, to show that plaintiff was not qualified for the position for which it selected her. *See Wexler*, 317 F.3d at 575 (noting that the qualification prong of the prima facie case should focus on objective criteria such as these). Rather, the only other reasons defendant offers to demonstrate that plaintiff was not qualified for

13

the Scheduling Agent I position are the same reasons defendant offers to explain why it removed plaintiff from the position.  Such evidence is appropriately considered at the second stage of the *McDonnell Douglas* analysis (employer's legitimate nondiscriminatory reason) rather than as part of the inquiry into a plaintiff's qualifications, and it is improper for the Court to conflate the two inquiries.  *Id.* at 574-75.  *See also Cline v. Catholic Diocese of Toledo*, 206 F.3d 651, 660-661 (6th Cir. 2000).  Because defendant has not introduced competent evidence that calls plaintiff's qualifications for the Scheduling Agent I position into question, this prong of the prima facie case is satisfied.

Defendant contends that plaintiff cannot establish the fourth prong of a prima facie case of race discrimination because she was replaced by Megan Brock, an African-American female who was hired into the Scheduling Agent I position on April 12, 2009.  (*See* Doc. 53, Henry Aff. at ¶ 12).  Plaintiff does not dispute defendant's factual contention.  Accordingly, plaintiff cannot establish the fourth prong of her prima facie case by showing she was replaced by someone outside the protected class.

However, a Title VII claimant can also establish the fourth prong of a prima facie case of discrimination by showing she was treated less favorably than a similarly-situated individual outside the protected class.  If the plaintiff seeks to establish that she was treated less favorably than a similarly-situated individual, she must prove that all relevant aspects of her employment situation were similar to those of the employee with whom she seeks to compare herself.  *Ercegovich v. Goodyear Tire & Rubber Co.,* 154 F.3d 344, 352 (6th Cir. 1998).  To be similarly-situated in a disciplinary context, the individuals must have dealt with the same supervisor, they must have been subject to the same standards, and they must have engaged in the same conduct

without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for that conduct. *Id.* (citing *Mitchell,* 964 F.2d at 583); *Smith v. Leggett Wire Co.,* 220 F.3d 752, 762 (6th Cir. 2000).

Plaintiff points to one instance of alleged disparate treatment, asserting that Henry assigned plaintiff and another African-American employee grades of "C" on their probationary evaluations for perfect attendance while an unnamed Caucasian member of their group received an "A" for perfect attendance. (Doc. 57, p. 27). However, this is not competent evidence of dissimilar treatment. Plaintiff and the employee with whom she seeks to compare herself were not similarly-situated as they were evaluated by different supervisors, Henry and Christi Pennington, who employed different grading standards. (*Id.,* Exh. 18). The evidence shows that Pennington gave employees varying grades for attendance whereas Henry gave all probationary employees a grade of "C" for perfect attendance and in fact passed a probationary employee who received a "C" for perfect attendance. (*Id.*). In any event, even if plaintiff were treated less favorably than a similarly-situated employee in this respect, there is no evidence that the grade of "C" in the attendance category led to either the extension of her probationary period or the termination of her employment as defendant acknowledged in the evaluation that plaintiff had perfect attendance. (*Id.*).

Because plaintiff cannot show that she was replaced by an individual outside the protected class or treated less favorably than a similarly-situated individual outside the protected class, plaintiff cannot establish the fourth prong of a prima facie case of race discrimination. Assuming plaintiff were able to satisfy her prima facie case, defendant has articulated a legitimate, nondiscriminatory reason for the adverse employment action. *See McDonnell*

15

*Douglas Corp. v. Green,* 411 U.S. 792, 802 (1973).  Defendant asserts that it terminated plaintiff due to poor performance during the probationary period.  Accordingly, plaintiff must come forward with evidence to show that the reason offered by defendant was not its true reason, but was a pretext for discrimination.  *Id.* at 804.

The Sixth Circuit has categorized different evidentiary bases for three types of pretext showings: 1) defendant's reasons had no basis in fact; 2) the reasons did not actually motivate the employer's decision; or 3) the reasons were insufficient to warrant the decision.  *Manzer v. Diamond Shamrock Chemicals Co.,* 29 F.3d 1078, 1084 (6th Cir. 1994), *overruled on other grounds by Gross v. FBL Financial Services, Inc.,* 129 S.Ct. 2343 (2009).  The first type of showing consists of evidence that the reason offered for the plaintiff's discharge never happened, *i.e.,* the reason is factually false.  *Id.*  The third showing ordinarily consists of evidence that other employees, particularly those outside the protected class, were not discharged even though they engaged in conduct substantially identical to that which purportedly motivated the plaintiff's discharge.  *Id.*  If the plaintiff establishes the first or third showing, a permissive inference of discrimination arises.  *Id.*  For the second showing, where the plaintiff admits the factual basis underlying the employer's proffered explanation and further admits that such conduct could motivate dismissal, the plaintiff must introduce additional evidence of discrimination because the reasons offered by the defendant are not directly challenged and therefore do not bring about an inference of discrimination.  *Id.*

Here, plaintiff has failed to produce evidence sufficient to create a genuine issue of material fact as to whether defendant's asserted reason for her discharge is pretextual.  Plaintiff has not pointed to evidence in the record to show that the call errors alleged by defendant never

16

happened and that the performance deficiencies did not exist. Plaintiff has not shown that other employees outside the protected class were not discharged for similar errors and performance deficiencies. Nor has plaintiff produced evidence that calls into question whether the reason provided by defendant was insufficient to motivate her discharge. Accordingly, there is no genuine issue of material fact on the discriminatory discharge claim. Defendant should be granted summary judgment in its favor on this claim as a matter of law.

### B. Retaliation claim

Title 42 U.S.C. § 2000e-3 makes it an unlawful employment practice for an employer to discriminate against an employee "because [she] has opposed any practice made an unlawful employment practice by this subchapter. . . ." Plaintiff claims she was retaliated against by being terminated on March 27, 2009, for complaining to Human Resources Director Gordon. (Doc. 57, pp. 17-18). Plaintiff alleges she complained to Gordon that Jenkins had retaliated against her for making complaints about racial discrimination, about receiving an unfair and biased probationary evaluation, and for associating with another black female in the department, Angela Whitterson, who had also complained about Jenkins. (*Id.*, p. 17). Plaintiff alleges that the record sufficiently demonstrates that she felt she had been discriminated and retaliated against when she complained to Gordon about her unfair probationary evaluation. (*Id.*, citing Springs Depo., p. 113).

Plaintiff also asserts there is evidence of a causal connection between her complaint to Gordon and her termination. First, plaintiff relies on the temporal proximity between her complaint and her termination. Plaintiff contends that the timing was suspicious as shown by the following sequence of events: (1) Jenkins advised plaintiff as part of her probationary

17

evaluation on January 13, 2009, that Cincinnati Children's would help her improve her performance; (2) a short time later, plaintiff complained to Gordon that Jenkins had mistreated her; (3) Jenkins informed plaintiff only days later that she was not fit for the job and she should start looking for employment elsewhere[5]; and (4) Jenkins called plaintiff into her office on two more occasions and repeated this information before terminating plaintiff's employment less than two months later. (Doc. 57 at 18-19, citing Exh. 19). Second, plaintiff alleges as further evidence of retaliation the following events which occurred after she made her complaint: Plaintiff received her lowest call score after sitting with an experienced agent who allegedly was not following departmental protocol, which casts suspicion on Jenkins' motive; Jenkins stopped saying good morning to her when she saw plaintiff having lunch with another African-American female, Whitterson, who had also complained to Human Resources about Jenkins; Gordon never investigated plaintiff's complaint or contacted plaintiff about it; and Cincinnati Children's failed to use empirical data to evaluate employees, which led to probationary employees receiving different grades for perfect attendance. (*Id.*, pp. 18-19). Plaintiff contends that the timing between her complaint and the adverse employment action, coupled with the remaining circumstances, is sufficient to permit an inference of retaliation.

Defendant contends that plaintiff cannot establish a viable Title VII retaliation claim.

---

[5]Plaintiff alleges in her opposing memorandum that the meeting at which she complained to Human Resources Director Gordon took place on February 3, 2009, and that Jenkins called plaintiff into her office soon afterwards on February 6, 2009, telling plaintiff she knew plaintiff had gone to Human Resources, that plaintiff was not fit for the job, and that she should begin looking for employment elsewhere. (Doc. 57, pp. 17-18, citing Exh. 19). However, plaintiff testified at her deposition that the meeting with Gordon took place on February 10, 2009. (Springs Depo., p. 113). The evidence also shows that plaintiff wrote in a letter to Gordon dated February 10, 2009: "Thank you for the time you afforded me on 2.10.09." (Springs Depo., Exh. 17). Thus, the evidence shows the meeting with the Human Resources Director took place on February 10, not February 3 as plaintiff alleges in her opposing memorandum, and that the allegedly retaliatory statements by Jenkins occurred before, and not after, plaintiff complained to Human Resources.

Defendant argues that plaintiff has not presented evidence that she engaged in protected activity under Title VII by opposing unlawful activity under the statute in that she never complained of race-based discrimination; plaintiff cannot demonstrate a causal connection between any alleged protected activity and her termination; and plaintiff cannot establish that defendant's articulated, legitimate non-retaliatory reason for her termination was pretextual.  (Doc. 53, pp. 16-20).

To prove a claim of retaliation, the plaintiff must demonstrate that (1) she engaged in protected activity; (2) the exercise of her civil rights was known by the defendant; (3) the defendant thereafter took an adverse employment action; and (4) a causal connection exists between the protected activity and the adverse employment action. *Ford v. Gen. Motors Co., 305 F.3d 545, 552-53 (6th Cir. 2002).* In order to receive protection under Title VII, a plaintiff's expression of opposition must concern a violation of Title VII. *See Fox v. Eagle Distributing Co., Inc.,* 510 F.3d 587, 591 (6th Cir. 2007) (applying the ADEA) (citing *Booker v. Brown & Williamson Tobacco Co.,* 879 F.2d 1304, 1313 (6th Cir. 1989) (employee's allegation that manager was a racist did not constitute protected activity under the ADEA because employee was not alleging employer was engaging in unlawful employment practice, and charge of "ethnocism" was too vague to constitute opposition to an unlawful practice)).  A vague charge of discrimination will not suffice to invoke the protections of the anti-discrimination statutes. *Id.* (citing *Booker,* 879 F.2d at 1313) ("A vague charge of discrimination in an internal letter or memorandum is insufficient to constitute opposition to an unlawful employment practice.")). "Otherwise, every adverse employment decision by an employer would be subject to challenge under either state or federal civil rights legislation simply by an employee inserting a charge of discrimination." *Id.* at 591-92.  It is not necessary that the practice the employee opposed

19

actually violated the anti-discrimination laws; rather, an employee is protected against employer

retaliation for opposing any practice that the employee in good faith believed to be a violation of

the anti-discrimination laws. *See Johnson v. University of Cincinnati*, 215 F.3d 561, 580 (6th

Cir. 2000).

 Here, plaintiff has not produced evidence to show she engaged in "protected activity"

within the meaning of Title VII's anti-retaliation provision. First, although plaintiff alleges in

her opposing memorandum that she complained about race discrimination to Human Resources

Director Gordon, plaintiff has not come forward with evidence in support of her allegation.

According to plaintiff's deposition testimony, plaintiff "think[s]" she "implied" during the

February 10, 2009 meeting with Gordon that she believed she had not been given a good reason

as to why her probation was being extended because of her race. (*Id.*, p. 112). However,

plaintiff testified that the only thing she recalled specifically telling Gordon is that she felt she

was being "singled out." (*Id.*, pp. 111-112, 114). Plaintiff testified that she may have also

complained she was being "discriminated against," but she did not recall complaining to Gordon

that she was being discriminated against because of her race. (*Id.*, pp. 187-88). Moreover,

plaintiff's letter to Gordon summarizing what she told Gordon during their meeting makes no

mention of discrimination of any type. (*Id.*, Exh. 17). Finally, although plaintiff alleges in her

opposing memorandum that she told Gordon in a meeting on February 3, 2009,[6] that "Jenkins

seemed to have it in for her and another black (African American) female (Whitterson)" (Doc.

57, p. 21), plaintiff testified at her deposition that she was not sure whether she told Gordon at

---

[6]This appears to be a reference to the February 10, 2009 meeting since plaintiff testified that the first time she met with Gordon was on February 10. (Springs Depo., p. 113).

their initial meeting in February that she thought Jenkins was mistreating her because of her relationship with Whitterson.  (Springs Depo., pp. 114-16).

Thus, drawing all reasonable inferences in plaintiff's favor, as the Court must on summary judgment, *see Smith Wholesale Co. v. R.J. Reynolds Tobacco Co.*, 477 F.3d 854, 861 (6th Cir. 2007), there is simply no evidence in the record that plaintiff told Gordon she had been discriminated against on the basis of her race.  At most, plaintiff made a vague complaint of discrimination to Gordon in their February meeting, when she "may" have told Gordon she was being "discriminated against" for some unspecified reason.  (Springs Depo., pp. 187-88).  In addition to being speculative, this allegation is too nebulous to constitute protected activity under Title VII. *See Fox*, 510 F.3d at 591. *See also Balding-Margolis v. Cleveland Arcade,* 352 F. App'x 35, 45 (6th Cir. 2009) (an individual cannot invoke the protections of anti-retaliation statute by making a vague charge of discrimination.).  Similarly, plaintiff's generalized complaint to Gordon that she was being "singled out" is too vague to support a finding that plaintiff opposed practices made unlawful under Title VII. *See Fox,* 510 F.3d at 592 (citing *Booker*, 879 F.2d at 1313). *See also Balding-Margolis*, 352 F. App'x at 45 (plaintiff did not engage in protected conduct where although she made several complaints to management concerning general work-related issues, complaints contained no indication she "was objecting to discriminatory conduct against her based on her membership in a protected class"); *Barber v. CSX Distrib. Servs.*, 68 F.3d 694, 701-02 (3d Cir. 1995) (holding that plaintiff's letter to Human Resources complaining about unfair treatment in general was not protected activity under the ADEA because letter did not specifically complain about age discrimination).  Finally, any complaint plaintiff may have made that Jenkins "seemed to have it in for her and another black"

21

female is too vague to constitute opposition to an unlawful employment practice under Title VII. *See Fox*, 510 F.3d at 592 (vague charge that management was "out to get" employee insufficient to constitute opposition to unlawful employment practice). Because plaintiff has not produced any evidence to show that her discussion with Gordon concerned alleged acts of race discrimination, plaintiff has failed to come forward with evidence to show that she engaged in protected activity under Title VII so as to establish a prima facie claim of retaliation.

Assuming plaintiff had engaged in protected activity and could establish a prima facie case of retaliation, plaintiff has not come forward with sufficient evidence to establish that defendant's reason for her termination was pretextual for the reasons stated above in connection with her discriminatory discharge claim. The undisputed evidence of record shows that plaintiff committed a number of errors when fielding calls and scheduling patients. Plaintiff has failed to produce evidence that calls into question whether these errors and the performance deficiencies that are thoroughly documented in the record were the actual reason for the termination or to cast doubt on whether they were a sufficient basis for her termination. Accordingly, plaintiff has failed to come forward with sufficient evidence to create a genuine issue of material fact on her retaliation claim, and summary judgment as a matter of law should be granted in favor of defendant on this claim.

### C. Hostile environment claim

Plaintiff contends that she can establish a hostile work environment claim in violation of Title VII. (Doc. 57, pp. 23-25). Discrimination that is "sufficiently 'severe or pervasive' to 'alter the conditions of [the victim's] employment and create an abusive working environment'" is actionable under Title VII. *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 67 (1986). To

establish a prima facie hostile environment case, plaintiff must establish that (1) she is a member of a protected class, (2) she was subjected to unwelcome harassment, (3) the harassment was based on her race, (4) the harassment had the effect of unreasonably interfering with her work performance by creating a hostile, offensive, or intimidating work environment, and (5) there is employer liability. *See Hafford v. Seidner,* 183 F.3d 506, 512 (6th Cir. 1999). To satisfy the fourth prong, plaintiff must show that the conduct to which she was subjected was sufficiently severe or pervasive to create an environment that a reasonable person would find hostile or abusive, and that she subjectively regarded the conduct as abusive. *Smith v. Leggett Wire Co.,* 220 F.3d 752, 760 (6th Cir. 2000) (citing *Jackson v. Quanex Corp.,* 191 F.3d 647, 658-59 (6th Cir. 1999)).

Plaintiff concedes that there is no overt evidence of racism in the record such as "name calling." (Doc. 57, p. 25). Plaintiff contends, however, that there is evidence of "subtle discrimination" by defendant that falls within the scope of Title VII. (*Id.*). Specifically, plaintiff alleges she was subjected to subtle discrimination when Gordon failed to investigate plaintiff's complaints of alleged harassment by Jenkins and plaintiff's race discrimination complaint; Jenkins thereafter harassed plaintiff by stating that she was trying to transfer her to another department after Gordon had told Jenkins that a transfer was not possible; and Gordon misrepresented in a letter to plaintiff that Cincinnati Children's had received and accepted her resignation, which precluded the EEOC from completing its investigation. (*Id.* at 24, citing Exhs. 5, lines 21, 26; Exhs. 8-11). Plaintiff contends that Gordon's acts and omissions are sufficient to impute liability to Cincinnati Children's under a theory of respondeat superior.

Defendant contends it is entitled to summary judgment on plaintiff's hostile environment

23

claim because under Sixth Circuit law, ignoring an employee and criticizing an employee's work is not severe and pervasive conduct that would rise to the level of a hostile work environment. (Doc. 53, pp. 19-21).

Defendant should be granted summary judgment as a matter of law on plaintiff's hostile environment claim. Plaintiff has failed to come forward with evidence to create a genuine issue of material fact as to whether she was subjected to harassment based on her race. First, as explained above in connection with plaintiff's retaliation claim, the evidence does not show that plaintiff complained to Gordon that Jenkins had taken action against plaintiff based on her race. Moreover, the evidence plaintiff cites does not support her allegation that Jenkins harassed her by falsely stating she was trying to transfer plaintiff to another department after Gordon had told Jenkins that a transfer was not possible. (*See* Doc. 57, citing Exhs. 10, 11). To the contrary, the correspondence between Gordon, Jenkins and Cincinnati Children's employee Maria Rodell shows that Gordon had informed Jenkins that an exception to defendant's policy prohibiting transfers for probationary employees was "doubtful" but that Gordon would make a request for a transfer. (*Id.*, Exh. 10).

In short, plaintiff has failed to show any harassment or offensive conduct directed against her because of her race. Although plaintiff was offended by Jenkins' criticisms of her job performance, plaintiff has not described conduct that a reasonable person would find hostile or abusive. Nor has plaintiff alleged that Jenkins committed any act that was physically threatening or humiliating. Thus, plaintiff's allegations fall far short of describing "race-based harassment that was 'sufficiently severe or pervasive to alter the conditions of [her] employment and create an abusive working environment.'" *Williams v. CSX Transp. Co., Inc.*, 643 F.3d 502,

24

512 (6th Cir. 2011).  Defendant should be granted summary judgment as a matter of law on

plaintiff's hostile environment claim under Title VII.

## IT IS THEREFORE ORDERED THAT:

Plaintiff's motion for leave to file the amended memorandum (Doc. 61) is GRANTED. Defendant's motion to strike the amended response (Doc. 59) is DENIED.  Defendant's motion to strike plaintiff's reply memorandum in response to defendant's reply in support of the motion for summary judgment (Doc. 64) is DENIED.

## IT IS THEREFORE RECOMMENDED THAT:

Defendant Cincinnati Children's motion for summary judgment (Doc. 53) be GRANTED.

Date: 4/17/2012

Karen L. Litkovitz
United States Magistrate Judge

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
### WESTERN DIVISION

LINDA SPRINGS,                                    Civil Action No. 1:10-cv-213
       Plaintiff,

                                        Weber, J.
     vs.                                          Litkovitz, M.J.


CINCINNATI CHILDREN'S
HOSPITAL MEDICAL CENTER,
       Defendant.

## NOTICE

Pursuant to Fed. R. Civ. P. 72(b), **WITHIN 14 DAYS** after being served with a copy of the recommended disposition, a party may serve and file specific written objections to the proposed findings and recommendations.   This period may be extended further by the Court on timely motion for an extension.  Such objections shall specify the portions of the Report objected to and shall be accompanied by a memorandum of law in support of the objections.  If the Report and Recommendation is based in whole or in part upon matters occurring on the record at an oral hearing, the objecting party shall promptly arrange for the transcription of the record, or such portions of it as all parties may agree upon, or the Magistrate Judge deems sufficient, unless the assigned District Judge otherwise directs.  A party may respond to another party's objections **WITHIN 14 DAYS** after being served with a copy thereof.  Failure to make objections in accordance with this procedure may forfeit rights on appeal. *See Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Walters,* 638 F.2d 947 (6th Cir. 1981

| SENDER: *COMPLETE THIS SECTION* | COMPLETE THIS SECTION ON DELIVERY |
|---|---|

**SENDER:** *COMPLETE THIS SECTION*

- Complete items 1, 2, and 3. Also complete item 4 if Restricted Delivery is desired.
- Print your name and address on the reverse so that we can return the card to you.
- Attach this card to the back of the mailpiece, or on the front if space permits.

1. Article Addressed to:

Linda Springs
3025 Glenview Avenue
Cincinnati, Ohio 45206

**COMPLETE THIS SECTION ON DELIVERY**

A. Signature

X ☑ Agent ☐ Addressee

B. Received by ( *Printed Name* )    C. Date of Delivery

D. Is delivery address different from item 1? ☐ Yes
   If YES, enter delivery address below: ☐ No

3. Service Type
   ☑ Certified Mail    ☐ Express Mail
   ☐ Registered    ☐ Return Receipt for Merchandise
   ☐ Insured Mail    ☐ C.O.D.

4. Restricted Delivery? (*Extra Fee*)    ☐ Yes

2. Article Number
   *(Transfer from service label)*    7002 3150 0000 8389 9050

PS Form 3811, February 2004    Domestic Return Receipt    102595-02-M-1540